1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12

UNITE EUROTHERAPY, INC., a
California Corporation,

Plaintiff,

13

v.

14
15
16
17

WALGREEN CO., an Illinois
Corporation, WALGREENS.COM,
INC., an Illinois Corporation; Does
1-10,

Defendant.

18

Case No.:  16-cv-01706-BTM-
JMA

**ORDER DENYING
DEFENDANTS' MOTION TO
DISMISS [DOC. 14]**

19
20
21
22
23

Defendant Walgreens Company and Walgreens.com, Inc. ("Defendants")
have filed a motion to dismiss Plaintiff Unite Eurotherapy, Inc.'s ("Plaintiff")
Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  For the
reasons discussed below, Defendants' motion is denied.

24
25

**I. BACKGROUND**

26
27
28

On September 14, 2016, Plaintiff, Inc. filed a First Amended Complaint
("FAC") alleging intentional interference with contractual relations and unfair
competition under 15 U.S.C. § 1125, the common law, and California Business &

1    Professions Code § 17200.  (FAC, ECF No. 10.)  According to the FAC, Plaintiff

2    develops and sells boutique hair care products under the federally trademarked

3    UNITE brand.  (FAC ¶¶ 7–8.)  Plaintiff's branded products are carefully marketed

4    and sold through its authorized resellers in order to keep its products off online

5    retail sites.  (FAC ¶ 9.)  Plaintiff also sells some of its products on its own

6    website.  (FAC ¶ 12.)  Plaintiff has distribution agreements with all of its resellers,

7    allowing those resellers to make sales only through limited channels and

8    prohibiting those resellers from selling Plaintiff's products through online or

9    internet channels.  (FAC ¶ 10.)  For approximately the last six years, all of

10   Plaintiff's resellers have agreed to this online resale restriction.  (Id.)  Additionally,

11   since about August 2010, Plaintiff's distribution agreements contain an Anti-

12   Diversion Agreement.  (FAC ¶ 11.)

13        The Anti-Diversion Agreement makes several prohibitions.  (Id.)  It prohibits

14   resellers from distributing "any product to any customer or account ("Account")

15   unless and until such Account has executed [Plaintiff's] most current form of anti-

16   diversion agreement."  (Id.)  The Anti-Diversion Agreement also prohibits

17   Plaintiff's resellers from selling "Product to persons or entities purchasing Product

18   in bulk" or to "any diverter or redistributors of products or to any other person or

19   entity reasonably believed to be purchasing Product for subsequent sale."  (Id.)

20   It also imposes an affirmative obligation on Plaintiff's resellers to report "any

21   person who attempts to buy Product for any purpose other than their personal

22   use in quantities meeting their home consumption needs," and to "assist [Plaintiff]

23   in the detection and reporting of sales of Product by Unauthorized Resellers."

24   (Id.)

25        On August 11, 2015, October 19, 2015, and February 22, 2016, Plaintiff

26   sent Defendants three demand letters, informing Defendants that the sellers of its

27   product contractually agreed not to sell those products over the internet and that

28   Defendants' online sale of Plaintiff's product was unauthorized.  (FAC ¶ 15.)

16-cv-01706-BTM-JMA

1  Despite being repeatedly informed that their online sales of Plaintiff's products

2  violated its distribution agreements, Defendants continued to offer for sale the

3  products on walgreens.com.  (FAC ¶ 18.)  Plaintiff alleges that this resulted in the

4  loss of two accounts and numerous other existing clients threatening to drop the

5  brand specifically due to the fact that the product is available on walgreens.com.

6  (FAC ¶ 19.)

## II. DISCUSSION

8  A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should

9  be granted only where a plaintiff's complaint lacks a "cognizable legal theory" or

10  sufficient facts to support a legal claim.  *Balistreri v. Pacifica Police Dept.*, 901

11  F.2d 696, 699 (9th Cir. 1988).  When reviewing a motion to dismiss, the

12  allegations of material fact in plaintiff's complaint are taken as true and construed

13  in the light most favorable to the plaintiff.  *Parks Sch. of Bus., Inc. v. Symington*,

14  51 F.3d 1480, 1484 (9th Cir. 1995).  In deciding a motion to dismiss, a court may

15  consider the facts alleged in the complaint, exhibits attached to the complaint,

16  and documents whose authenticity is not questioned and upon which the

17  plaintiff's complaint necessarily relies on, even if not physically attached to the

18  complaint.  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

19  Although detailed factual allegations are not required, factual allegations

20  "must be enough to raise a right to relief above the speculative level."  *Bell*

21  *Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).  "A plaintiff's obligation to prove

22  the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

23  conclusions, and a formulaic recitation of the elements of a cause of action will

24  not do."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more

25  than the mere possibility of misconduct, the complaint has alleged - but it has not

26  show[n] that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679

27  (2009) (internal quotation marks omitted).  Only a complaint that states a

28  plausible claim for relief will survive a motion to dismiss.  *Id.*

## A.    Intentional Interference with Contractual Relations

Defendants move to dismiss Plaintiff's first claim for intentional interference with contractual relations, arguing that Plaintiff has failed to state sufficient facts to support each element of its claim.  (Defs.' Mot. to Dismiss ("Defs.' MTD") 3, ECF No. 14–1.)

In order to establish a prima facie case for intentional interference with contractual relations, a plaintiff must show: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).  Unlike the tort of intentional interference with prospective economic advantage, "it is not an element of the action that the defendant's conduct be wrongful apart from the interference itself."  *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 55 (1998).

### 1. Element 1

First, Defendants argue that Plaintiff has failed to sufficiently allege a valid contract between Plaintiff and a third party.  (Defs.' MTD 4.)

Defendants' argument primarily rests on the fact that Plaintiff has not identified the third party or parties with whom it contracted.  They rely on *UMG Recordings, Incorporation v. Global Eagle Entertainment, Incorporation*, 117 F. Supp. 3d 1092, 1115 (C.D. Cal. 2015), for the proposition that to plead an adequate claim, a party must identify the third party or parties with whom it contracted.  There, the plaintiffs alleged that the counterclaimants failed to plead facts that identified the specific contractual relationships with which they purportedly interfered.  *Id.* at 1115.  The counterclaimants merely alleged that they had "Airline Contracts," and that they were attempting to enter into additional contracts.  *Id.*  As the court noted, they supplied no additional facts concerning

1   the identity of any third party with whom they had contracted.  *Id.*  The court held

2   that "[t]his require[d] dismissal of the claim, because 'to understand whether the

3   counterclaimants' performance was disrupted require[d] the district court to

4   determine what contractual rights they possessed." *Id.* (quoting *United Nat'l*

5   *Main., Inc. v. San Diego Convention Ctr.*, 766 F.3d 1002, 1009 (9th Cir. 2014)

6   (alteration in original).

7        While the court in *UMG Recordings* held that the counterclaimants had to

8   identify the third party or parties with whom they contracted, it was for the

9   purpose of determining what contractual rights they possessed.  *Id.*  Here,

10  however, Plaintiff has pleaded enough facts from which the Court can determine

11  what contractual rights it possessed.  Though Plaintiff did not specifically identify

12  a third party, it did allege that one of its resellers has been selling its products to

13  Defendants.  (FAC ¶ 16.)  It further noted that it has distribution agreements with

14  all of its resellers, limiting the sale of its product to only signatories of the Anti-

15  Diversion Agreement and prohibiting its resellers from selling its products through

16  online or internet channels.  (FAC ¶¶ 10–11.)  In fact, Plaintiff attached Exhibit 3

17  to the FAC as an example of the standard distribution agreement with the

18  relevant resale restriction terms.  (FAC Ex. 3.)  Plaintiff alleged that for

19  approximately the past six years, all of Plaintiff's resellers have agreed to the

20  resale terms found in section 1.3 of the distribution agreement.  (FAC ¶ 10.)

21       The Court therefore finds that Plaintiff has stated sufficient facts to

22  demonstrate the existence of a valid contract between plaintiff and a third party.

23       ***2. Element 2***

24       Second, Defendants argue that Plaintiff has failed to demonstrate that they

25  had knowledge of a valid contract between Plaintiff and a third-party.  (Defs.'

26  MTD 6.)

27       Plaintiff relies on *Sebastian International, Incorporation v. Russolillo*, 162 F.

28  Supp. 2d 1198 (C.D. Cal. 2001), to argue that Defendants were on notice that the

1  entire class of Plaintiff's resellers had restrictive contracts with Plaintiff that

2  Defendants were interfering with.  (Pl.'s Opp'n to Defs.' MTD ("Pl.'s Opp'n") 7,

3  ECF No. 15.)  There, the plaintiff, a designer and distributor of professional hair

4  products, brought an action against several retailers and distributors of its

5  products, including a claim of intentional interference with contractual relations

6  against the defendants CVS and Rite Aid.  *Id.* at 1201.  The plaintiff notified the

7  defendants on several occasions of the existence and substance of its contracts

8  with distributors restricting the sale of its products to salons.  *Id.*  Despite knowing

9  that the sale would disrupt existing contractual relations, the defendants

10  continued to sell the products.  *Id.*  The defendants argued that in order to prove

11  that they had knowledge of the contracts between the plaintiff and a third party,

12  the plaintiff had to identify the specific contractual relations they disrupted.  *Id.* at

13  1203.  The court found this argument unavailing.  *Id.*  It stated: "the plaintiff does

14  not have to identify the specific contractual relations which have allegedly been

15  disrupted . . . . [S]uch intent can be certainly inferred if the defendant knows that

16  contractual relations with a third party exist, but does not know the specific

17  identity of the contractual party."  *Id.* at 1204.  It was undisputed that the plaintiff

18  informed both defendants of their "salon only" distribution scheme and that their

19  continued sales were disrupting its contractual relationships with both its salons

20  and distributors.  *Id.*  The plaintiff also provided the defendants with a

21  representative list of salons and distributors with whom the plaintiff had

22  contractual relations, as well as specific information regarding two salons

23  involved in diverting its products.  *Id.*  The court, therefore, found that the

24  defendants were on notice as to the class of contracting salons with whom the

25  plaintiff had contractual relations.  *Id.*

26       Defendants argue that the court in *Sebastian International* "ruled that notice

27  was found only because the plaintiff gave the defendant a list of actual customers

28  . . . ."  (Def,'s Reply 3, ECF No. 16.)  While the plaintiff in *Sebastian International*

1  did provide the defendants with specific information related to two involved

2  salons, it was not *the* determining factor.  The court in *Sebastian International*

3  relied on *Ramona Manor Convalescent Hosp. v. Care Entreprises*, 177 Cal. App.

4  3d 1120 (1986), in determining what is required to satisfy the second element of

5  this tort under California law.  In *Ramona*, the court upheld an interference with a

6  contract claim even though the defendant never knew with whom the plaintiff had

7  contracted.  *Id.* at 1133.  The defendant was merely aware that the plaintiff had

8  entered into a relationship with someone other than itself for future operation of a

9  nursing facility and knew that the prospective operator's contractual rights would

10  be frustrated by its actions.  *Id.* at 1132.  Relying on the Restatement Second of

11  Torts, the court held that "the rule does not require . . . that the person who loses

12  the performance of the contract as a result of the conduct of the actor should be

13  specifically mentioned by name.  It is sufficient that he is identified in some

14  manner . . . ." *Id.* at 1133 (quoting Rest.2d Torts § 766, com. P. 15.)  The court

15  therefore found that the defendant's decision to hold over beyond the termination

16  of its lease was made with knowledge that its actions would frustrate the

17  contractual expectations of a specific, though unnamed, lessee.  *Id.*

18        Here, Plaintiff alleged in its FAC that it:

19  notified [Defendants] on at least three separate occasions that [Plaintiff] did
20  not authorize the online sale of its products by third parties, and further
    informed [Defendants] at least twice that [Plaintiff's] Distribution Agreement
21  with its limited network of resellers strictly prohibited online sales or sales to
    Unauthorized Resellers—such as [Defendants].
22

23  (FAC ¶ 15.)  Plaintiff also attached as exhibits three letters it sent to Defendants,

24  notifying them of its contractual relationships with its resellers.  (FAC, Ex. 4–6.)

25  The October 19, 2016 and February 22, 2016 letters both state that "Walgreens

26  continues to intentionally interfere with Unite's contracts each time it purchases

27  more Unite products by diverting products from salons through its continuing

28  unauthorized online sales." (FAC, Ex. 5–6.)  Although Plaintiff did not identify the

1 | specific contractual relations, it did provide Defendants with notice of the class of

2 | contractual relations being potentially disrupted by its continuous sale of

3 | Plaintiff's products.

4 | The facts are therefore sufficient to satisfy the second element.

5 | ### 3. Elements 3–5

6 | Lastly, Defendants suggest that Plaintiff has not demonstrated that

7 | Defendants' alleged wrongful conduct was intentional, and that it resulted in an

8 | actual breach and damages.  (Defs.' MTD 7.)

9 | As noted by the California Supreme Court, "the tort of intentional

10 | interference with performance of a contract does not require that the actor's

11 | primary purpose be disruption of the contract."  *Quelimane Co.*, 19 Cal.4th at 56.

12 | It applies to "an interference that is incidental to the actor's independent purpose

13 | and desire but known to him to be a necessary consequence of his actions."  *Id.*

14 | Plaintiff alleged that after being notified of Plaintiff's contractual relationship with

15 | its resellers, Defendants continued to interfere with the distribution agreement by

16 | purchasing Plaintiff's product from resellers and selling it online at

17 | walgreens.com.  (FAC ¶ 23.)  Because Plaintiff's product was available at

18 | walgreens.com, Plaintiff allegedly lost two accounts.  (FAC ¶ 19.)  Thus, the

19 | Court finds that Plaintiff has stated enough facts to support a legal claim.

20 | Defendant's motion as to Plaintiff's first cause of action is **DENIED**.

21 |

22 | **B.    Unfair Competition**

23 | Plaintiff asserts claims for unfair competition under 15 U.S.C. § 1125(a),

24 | California Business and Professions Code § 17200, and the common law.  (FAC

25 | ¶¶ 31–38.)  Defendants move to dismiss Plaintiff's claims for unfair competition.

26 | (Defs.' MTD 9.)

27 | ### 1. Unfair Competition Under 15 U.S.C. § 1125

28 | Defendants argue that Plaintiff's claim, based on a likelihood of confusion

1    with respect to the quality of its products, is an incorrect application of the

2    Lanham Act.  (Defs.' MTD 9–10.)

3         Section 43(a)(1)(A) of the Lanham Act states:

4         Any person who, on or in connection with any goods or services, . . . uses
          in commerce any word, term, name, symbol, or device, or any combination
5         thereof, or any false designation of origin, false or misleading description of
          fact, or false or misleading representation of fact, which is likely to cause
6         confusion, or to cause mistake, or to deceive . . . as to the origin,
          sponsorship, or approval of his or her goods, services, or commercial
7         activities by another . . . shall be liable in a civil action by any person who
8         believes that he or she is or is likely to be damaged by such act.
9

10   15 U.S.C. § 1125(a)(1)(A).  Courts have uniformly held that the Lanham Act

11   "fashioned a new federal remedy against a particular kind of unfair competition

12   that common law had effectively protected."  *New West Corp. v. NYM Co. of*

13   *California, Inc.*, 595 F.2d 1194, 1198 (9th Cir. 1979).  "The purpose underlying

14   the enactment of the section was to make actionable the deceptive use of false

15   designations of origin."  *Id.*  Under the Lanham Act, the decisive test is whether

16   the public is likely to be deceived or confused by the similarity of the marks.

17   *Smith v. Chanel, Inc.*, 402 F.2d 562, 563 (9th Cir. 1968).

18        Ordinarily, a trademark owner's right under the Lanham Act to control

19   distribution of its own products is limited by the first sale doctrine.  *See Sebastian*

20   *International, Incorporation v. Longs Drug Stores Corporation*, 53 F.3d 1073,

21   1074 (9th Cir. 1995).  Under the first sale doctrine, "[r]esale by the first purchaser

22   of the original article under the producer's trademark is neither trademark

23   infringement nor unfair competition."  *Id.*  However, the Ninth Circuit has also

24   recognized the quality control exception to the first sale doctrine.  *See Enesco*

25   *Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1087 (9th Cir. 1998).  Where the

26   distribution of a product that does not meet the trademark holder's quality control

27   standards results in the devaluation of the mark by tarnishing its image, the "non-

28   conforming product is deemed for Lanham Act purposes not to be the genuine

9

1  product of the holder, and its distribution constitutes trademark infringement." *Id.*

2  (citing *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (9th Cir. 1996).

3  This theory exists because "[o]ne of the most valuable and important protections

4  afforded by the Lanham Act is the right to control the quality of the goods

5  manufactured and sold under the holder's trademark." *El Greco Leather Prods.*

6  *Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986).  The critical

7  question in determining whether the quality control exception applies is "whether

8  the public is likely to be confused as a result of the lack of quality control." *Id.*

9  The alleged defect must be in the product itself that the customer would not be

10  readily able to detect.  *Id.*

11      In its Opposition, Plaintiff asserts namely two avenues of unfair competition

12  under the Lanham Act.  (Pl.'s Opp'n 12.)  First, Plaintiff argues that its allegations

13  support a claim that Defendants' actions are likely to deceive consumers into

14  believing that Defendants' sales of Plaintiff's product are authorized by Plaintiff.

15  (Id.)  The Court finds that this claim is barred by the first sale doctrine.  Second,

16  Plaintiff argues that its allegations support a claim that Defendants' actions are

17  likely to deceive consumers about the quality of the product, "because the

18  unauthorized sales are dumping old product of degraded quality into the

19  marketplace."  (Id.)  The Court finds that the quality control exception to the first

20  sale doctrine applies to this claim.

21      Plaintiff has alleged that it takes special precautions to ensure the quality of

22  its product.  Plaintiff's products undergo extensive testing and research, so as to

23  ensure their superior performance and acceptance by professional salons.  (Id. ¶

24  7.)  Plaintiff carefully markets and sells its products through authorized sellers so

25  as to keep these "salon only" products off online retail sites.  (Id. ¶ 9.)  It also

26  sells its products on its own website, but only with a carefully designed platform

27  for consumers to ensure the quality of the product.  (Id. ¶ 12.)  Plaintiff

28  emphasizes the importance of consumers consulting with authorized salons as

16-cv-01706-BTM-JMA

1  part of their purchase or following its own carefully designed process when

2  purchasing the product because online retail sites tend to "'dump' products that

3  have been sitting on shelves or in warehouses for too long and therefore of

4  lesser quality." (Id. ¶ 13.)  The alleged defect, the age of the product, is not

5  something a consumer could readily detect.  Based on the alleged facts, the

6  Court finds that Plaintiff has adequately pled a Lanham Act claim.

7      Thus, Defendants' motion as to Plaintiff's unfair competition claim under the

8  Lanham Act is **DENIED**.

9      ### *2. Unfair Competition Under the Common Law*

10     Defendants also move to dismiss Plaintiff's common law claim.  (Defs.'

11 MTD 10.)  In its Opposition, Plaintiff appears to rest its common law claim on two

12 grounds.  (Pl.'s Opp'n 13.)

13     First, Plaintiff argues that Defendants are impermissibly selling its product

14 online and deceiving consumers about the quality of the product.  (Pl.'s Opp'n

15 13.)  This claim is the same as that alleged under the Lanham Act.  The Ninth

16 Circuit has held that state common law claims of unfair competition and actions

17 under California Business and Professions Code § 17200 are "substantially

18 congruent to claims made under the Lanham Act."  *Denbicare U.S.A., Inc. v.*

19 *Toys "R" Us, Inc.*, 84 F.3d 1143, 1152 (9th Cir. 1996) *abrogated in part by*,

20 *Kirtsaeng v. John Wiley & Sons, Inc.*, __ U.S. __, 133 S. Ct. 1351 (2013).

21 Therefore, to the extent Plaintiff's common law claim is based on the likelihood of

22 consumer confusion regarding the quality of the product, it is adequately pled.

23     Second, Plaintiff argues that Defendants' tortious interference with

24 business relationships also falls under the unfair competition umbrella.  (Pl.'s

25 Opp'n 13.)

26     The California Supreme Court in *Bank of the West. v. Superior Court*, 2

27 Cal.4th 1254 (1992), addressed the meaning of common law unfair competition

28 under California law.  At issue was whether a general liability insurance policy

16-cv-01706-BTM-JMA

1    providing coverage for damages arising out of "unfair competition" covered

2    damages arising out of Bank of the West's advertising activities. *Id.* at 1260. In

3    deciding that the policy only covered common law unfair competition and not

4    statutory unfair competition, the court stated:

5
6
7
8
9
10
> The common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another. The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection. According to some authorities, the tort also includes acts analogous to 'passing off,' such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market.

11    *Id.* at 1263 (citations omitted).

12        Notwithstanding the California Supreme Court's characterization of

13    common law unfair competition, Plaintiff relies on *Hewlett-Packard Company v.*

14    *Cigna Property & Casualty Insurance Company*, No. CIV. 99-20207 SW, 2000

15    WL 255990, at *6 (N.D. Cal. Aug. 24, 1999), to argue that the common law tort of

16    unfair competition encompasses a variety of tortious conduct, including tortious

17    interference with business relationships, disparagement of a competitor's goods,

18    and competitive injury. (Pl.'s Opp'n 13.) In *Hewlett-Packard*, the court

19    addressed whether an insurer had a duty to indemnify under a policy that

20    covered "unfair competition" where the claims in the underlying action were not

21    based on allegations of "passing off," but rather on false representations and

22    false advertising. *Id.* at *5. The insured argued that the tort was broader than

23    passing or palming off goods, and included claims for damages based on a

24    competitor's misleading advertising. *Id.* at *6. While the court recognized *Bank*

25    *of the West*'s characterization of the common law unfair competition, it departed

26    from its reasoning and argued that it was merely dicta. *Id.* The court instead

27    looked to the meaning a layperson would ordinarily attach to "unfair competition."

28    *Id.* It held that "unfair competition," as commonly understood, encompassed

1 | claims beyond just passing off or palming off goods and included claims for false

2 | advertising and other tortious conduct resulting in competitive injury. *Id.* at \*7.

3 | As Defendants note, no court has followed *Hewlett-Packard* since its

4 | publication almost 17 years ago. (Defs.' Reply 7.)  Though the California

5 | Supreme Court's discussion in *Bank of the West*'s is arguably dicta, Plaintiff's

6 | attempt to extend common law unfair competition beyond "passing off" or

7 | analogous acts is unavailing.  The Ninth Circuit and district courts in California

8 | have followed the California Supreme Court's characterization of common law

9 | unfair competition, limiting the claims to those that allege "passing off" or acts

10 | analogous to "passing off."  *See Sybersound Records, Inc. v. UAV Corp.*, 517

11 | F.3d 1137, 1153 (9th Cir. 2008) (relying on *Bank of the West* and affirming the

12 | district court's dismissal of a claim under common law unfair competition where

13 | the plaintiff did not allege that the defendants had passed off their goods as

14 | those of another nor that they exploited trade names or trademarks); *see also*

15 | *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1147 (9th Cir. 1997)

16 | (affirming dismissal of the plaintiff's common law unfair competition claim where

17 | the allegations did not amount to "passing off" or its equivalent); *see also*

18 | *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1187–88 (S.D. Cal.

19 | 2012) (rejecting the defendant's attempt to extend common law unfair

20 | competition beyond its grounding in consumer deception); *see also Oracle Corp.*

21 | *v. DrugLogic, Inc.*, No. C 11-00910 JCS, 2011 WL 5576267, at \*14 (N.D. Cal.

22 | Nov. 16, 2011) (holding that the defendant's counterclaim for unfair competition

23 | failed to state a claim because no passing off, or any analogous claim, was

24 | alleged).  Therefore, Defendants' alleged tortious interference with business

25 | relationships does not fall within the umbrella of common law unfair competition

26 | claim.

27 | However, as discussed above, to the extent Plaintiff's claim under the

28 | common law rests on the likelihood of confusion as to the quality of its products,

16-cv-01706-BTM-JMA

1  Defendants' motion to dismiss is **DENIED**.

2        *3. Unfair Competition Under Cal. Bus. & Prof. Code § 17200*

3        Defendants only move to dismiss Plaintiff's section 17200 claim if the Court

4  dismisses Plaintiff's first cause of action for intentional interference with

5  contractual relations.  (Defs.' MTD 11.)  Plaintiff argues that because it plausibly

6  pled intentional interference with contractual relations, it has sufficiently alleged

7  an "unlawful" business practice under section 17200.  (Pl.'s Opp'n 13–14.)

8
9        The UCL prohibits "unlawful, unfair or fraudulent business act[s] or

10  practice[s]."  Cal. Bus. & Prof. Code § 17200.  "Each of these three adjectives

11  captures a separate and distinct theory of liability."  *Rubio v. Capitol One Bank*,

12  613 F.3d 1195, 1203 (9th Cir. 2010).  Its coverage is broad and sweeping, and

13  embraces "anything that can properly be called a business practice and that at

14  the same time is forbidden by law."  *Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.*,

15  20 Cal.4th 163, 180 (1999).  "By proscribing 'any unlawful' business practice,

16  'section 17200 borrows violations of other laws and treats them as unlawful

17  practices' that the unfair competition law makes independently actionable."  *Id.*

18  (quoting *State Farm Fire & Casual Co. v. Superior Court*, 45 Cal. App. 4th 1093,

19  1103 (1996)).

20        As discussed above, the Court finds that Plaintiff has sufficiently pled its

21  first claim.  Thus, Defendants' motion to dismiss Plaintiff's unfair competition

22  claim under section 17200 is **DENIED.**

23  //

24  //

25  //

26  //

27  //

28  //

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III. CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss (ECF No. 14) is **DENIED.**

**IT IS SO ORDERED.**

Dated: February 7, 2017

Barry Ted Moskowitz, Chief Judge
United States District Court

15

16-cv-01706-BTM-JMA